**Commonwealth v. Greene**

*William Cannon*, Assistant District Attorney, for Commonwealth.

*A. Benjamin Johnson, Jr.*, for defendant.

BARBIERI, J., February 25, 1974.—Defendant in this case, Oliver Greene, is an informer, turned confessor. He now stands charged with the murder of his wife's sister. Presently before this court is the question of whether or not his inculpatory statements made to the police should be suppressed. Basically, defendant contends that the suppression he seeks should be granted under the unnecessary delay ruling expounded by the Supreme Court in the case of Commonwealth v. Futch, 447 Pa. 389, 290 A. 2d 417 (1972). The circumstances in this case are unique and, in the opinion of this court, take this case out of the Futch category.

The doctrine expounded in Futch has been characterized as a little McNabb-Mallory rule for Pennsylvania. Under this rule, all evidence obtained during unnecessary delay between arrest and arraignment must be excluded except that which has no reasonable relationship to the delay. As we read Futch and its progeny,[1] Oliver Greene's confession must be suppressed unless the delay after arrest and arraignment became legally permissible was necessary or there was no causal relationship between the delay and the confession.

The Futch rule derives from the interpretation by the Supreme Court of Pennsylvania of its Rules of Criminal Procedure 116, 118 and 119. Rules 116 and 118 are concerned with preliminary arraignment of

---

[1] See Commonwealth v. Tingle, 451 Pa. 241 (1973); Commonwealth v. Dutton, 453 Pa. 547 (1973); Commonwealth v. Wayman, 454 Pa. 79 (1973).

arrested persons, respectively, with and without a warrant. Rule 118, applicable to this warrantless case, reads, in part:

"When a defendant has been *arrested* without a warrant, he shall be taken without unnecessary delay before the proper issuing authority where a complaint shall be filed against him." (Italics supplied.)

The term "arrested" is emphasized in the above quotation because in this case, as will appear, a crucial question is as to when the arrest actually took place.

Rule 119 deals with the duties of the issuing authority with regard to arrestees brought before him. This includes detailed information required to be given to the accused including advice as to defendant's right to secure counsel of his choice. For this reason, our Supreme Court has deemed it to be a denial of one of a defendant's basic rights to unreasonably delay his opportunity for judicial advice at the arraignment. We see the Futch doctrine as one having to do with the use made of defendant's time in custody following his arrest. When the delay in preliminary arraignment following arrest is (1) unreasonably prolonged, and (2) such unreasonable delay is causally related to inculpatory statements of defendant after arrest, it is presumed that defendant would not have made the statements after prompt Rule 119 advices by the issuing authority; and that, therefore, the statements should be suppressed.

Our Futch inquiry in this case requires that this court, as trier of factual issues on a suppression petition, make three factual determinations: (1) When did an arrest of defendant take place; (2) was there unnecessary delay between the time when defendant was "arrested" and the arraignment; and (3) was that delay, if it was unnecessary, in any way a causative factor in the obtaining of inculpatory statements made

by defendant to the police? In addition there is, as always, the question of voluntariness, quite aside from the delay. This form of coercion of the arrestee's will which may itself render the confession and remarks vulnerable as a matter of law or in the eyes of the jury will be treated separately, later in this opinion.

Defendant's meeting and experiences with the police are briefly as follows:

The stabbed and mutilated body of Adelaide Forbes, defendant's sister-in-law, was found on April 21, 1972, at 11:30 a.m. She had been dead for some time. Defendant confessed to causing her death in a bizarre homicide during the morning of April 8, 1972, about two weeks before her body was found. On the day following the disclosure of her death, April 22, 1972, acting on the suggestion of defendant's mother-in-law, the victim's mother, defendant telephoned the police at 10:30 a.m. offering to give evidence as to who was the murderer of his wife's sister. The police offered to send a vehicle for him, but defendant rejected the offer and stated that he would go to the Police Administration Building by transportation supplied by himself, which he did. As an informer, he sought to inculpate as the murderer one Jerry Cauthen, stating at some length to the police his reasons why Jerry should be considered as the murderer of his wife's sister. He was questioned off and on without arrest until the forenoon of the following day, during which time the police were engaged in running down the leads supplied by defendant with regard to Jerry, principally seeking to find this accused man. They did not find Jerry Cauthen until the next day, Sunday, April 23, 1972. At 11:30 a.m. on that day, defendant, while resting alone after breakfast and a half-hour interview period, sent for the interviewer and spontaneously admitted the killing.

On the twenty-second, however, because of defend-

ant's charges against Cauthen, in seeking to test the veracity of Greene, the police asked defendant if he would take a polygraph test. Defendant agreed, the test was carried out between 4 and 5 p.m., and the result showed positive reactions indicating untruthful answers to questions which cast doubt upon the accusations against Cauthen and suggested guilt on the part of defendant. The police advised defendant of this, and, at 9:45 p.m., defendant revealed that he had seen the body of decedent in a secret morning visit to her apartment on April 8, 1972, some 13 days before the police or any other person had knowledge of her death. The interrogating policeman, Detective McGowan, at this point became suspicious of defendant who previously had been given Miranda warnings. McGowan testified that he then felt that defendant should not have been permitted to leave at that time.[2] He did not communicate this feeling to defendant, however, and conversations went on, with intervals for meals, personal comfort and rest, until defendant, as previously noted, spontaneously and not in response to questions, offered statements while in a rest period admitting that he killed his sister-in-law. This first inculpatory statement was made at a session between 11:30 a.m. and 12 noon on April 23, 1972. Defendant then rested for 50 minutes from 12 to 12:50 p.m. He was recorded as eating from 12:50 p.m. to 1 p.m. when a formal statement was made following renewed Miranda warnings. The statement was completed, read and signed by defendant by 2:30 p.m. Defendant rested until 4:15 p.m. when he was slated. He subsequently was taken to the cell room where processing

---

[2] Detective Stanton, who interviewed defendant later on that day testified that then, in the afternoon of April 22, 1972, defendant was free to leave.

procedures were carried out until his arraignment at 8:30 p.m.

Due to the unique circumstances in this case, we hold that Greene was not subject to a coercive environment as a result of delay. While defendant may indeed have been under some pressure, if so, it was pressure generated by his own actions and conscience and not any product of police illegality. Therefore, we hold that defendant's confession was not reasonably related to the unnecessary delay between arrest and arraignment.

Defendant also alleges that his confession was involuntary. The ultimate test of voluntariness is whether considering the totality of the circumstances, the confession is the product of an essentially free and unrestrained choice by its maker: Commonwealth v. Riggins, 451 Pa. 519, 524. Here, it is uncontradicted that Greene was subjected to intermittent police questioning over a period of 24 hours prior to the confession. There is no testimony that defendant slept at all during the hours of police custody. Moreover, although the delay between arrest and arraignment was not, by itself, sufficient to suppress the confession, it is a circumstance to be taken into consideration in the determination of voluntariness.

Despite these circumstances surrounding the confession which it is urged establish that it may not have been the product of a free and unrestrained will, countervailing evidence convinces us that the confession was voluntary. Defendant, 30 years of age and with a high school education, initiated the questioning by voluntarily appearing at police headquarters and claiming to have information as to the murderer of his sister-in-law. He was given his Miranda warnings before being asked any questions. Throughout the period, the police were solicitous of Greene's physical

needs. He was given four meals and taken to the men's room four times during the 24-hour period. Furthermore, despite the length of time involved, defendant was not subjected to the intensive, continuous interrogation which was determinative in Riggins, supra, and Commonwealth ex rel. Butler v. Rundle, 429 Pa. 141 (1968).

In Riggins, defendant was subjected to nearly 11½ hours of interrogation during a total of 16 hours of detention after arrest. In Butler, defendant was questioned for 10 hours after arrest with practically no respite. Here, defendant was involved in self-initiated discussions for 13 hours out of a total stay at police headquarters of 24 hours. After defendant in this case made the statement to Detective McGowan that he had found the body on April 8, 1972, in an admission at some time between 9:30 a.m. to 10:30 p.m. on April 22, 1972, he was intermittently interrogated for a total of only five hours in the ensuing 13-hour period. Greene was given ample periods of rest. Throughout the questioning, he was alert, responsive and cooperative. Particularly revealing on this question are the circumstances directly preceding the confession. Defendant was alone in the interrogation room between 5 and 8:45 a.m. on April 23, 1972, at which time he was taken to the men's room. At 9 a.m. he was given a meal and at 10:30 a.m. questioned until 11 a.m. by Detective McGowan. At this time, he repeated exculpatory statements of the night before. At 11 a.m. he was taken to the men's room and at 11:30 a.m. he was alone in the interrogation room when he called Detectives McGowan and Richardson into the room and confessed. In the 6½ hours immediately prior to the confession, defendant was questioned for a total of 30 minutes. His confession was not directly responsive to police questioning. Throughout the period of

detention, we find that no coercive tactics, either physically through the use of handcuffs, beatings and the like, or mentally through threats or promises, were employed by the police. The prolonged period in police custody, often by itself a coercive factor, was not a coercive element here, since defendant was not told he was under arrest until after his confession. We are convinced by the totality of the circumstances that Greene's confession was voluntary.

Defendant further asserts that the confession must be suppressed due to the failure of the police to rewarn Greene of his constitutional rights at some time following his arrest. There is no prophylactic rule that a suspect must be rewarned of his constitutional rights each time custodial interrogation is renewed: Commonwealth v. Bennett, 445 Pa. 8 (1971). Whether a defendant must be rewarned depends on the totality of the circumstances. Among the tests prescribed in Bennett are: (1) the length of time between warnings and challenged interrogation; (2) whether the interrogation was conducted at the same place where warnings were given; (3) whether the same interrogating officer was involved; and (4) whether materially different statements were given.

Applying the Bennett criteria, Justice Roberts, in Riggins, found that 17 hours of near continuous interrogation separated the warnings from defendant's confession; the interrogation sessions were held at police headquarters, while the warnings were given in a police car; the officer who gave defendant his Miranda warnings at the scene of arrest never interrogated him and the oral confession was "materially different" from the previous denials. The court held, Mr. Chief Justice Jones dissenting, that the confession must be suppressed due to the failure of the police to rewarn defendant during the questioning.

Here, the length of time between the warnings and the confession was 23 hours, longer than in Riggins, and, as in Riggins, the oral confession was "materially different" from the previous denials of defendant. However, additional circumstances distinguish the instant case from Riggins. The interrogations were conducted at the same place the warnings were given. Defendant confessed spontaneously, i.e., not in response to questioning during an interrogation session. Greene confessed to the same detective who had given his Miranda warnings. Defendant in Riggins was 17 years old, Greene is 30 years old and a high school graduate. Perhaps, significantly, Greene knew something of his rights prior to receiving the warnings. Under these circumstances, the police were not obligated to rewarn defendant of his rights at some time prior to the warnings in connection with his formal confession.

Finally, defendant contends that he suffered an arrest without probable cause. We view this question as one controlled by the same factual question on which the Futch delay question turns. Obviously, there was no arrest of Greene at the outset, because he came as a volunteer in the role of an informer. On all of the evidence which we accept in our findings, it is our conclusion that no probable cause for arrest or for arraignment existed until defendant's spontaneous confession took place at 11:30 a.m. on April 23, 1972.

As previously noted, the polygraph examination resulted unfavorably to defendant and brought on the statement by him at 9:45 p.m. on April 22, 1972, that he had seen decedent's body on the morning of April 8, 1972. These circumstances raised suspicions of guilt on the part of defendant, but we believe not sufficient to constitute probable cause. Probable cause, of course,

exists when the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that the suspect had committed a crime: Commonwealth v. Bishop, 425 Pa. 175 (1967). Courts have generally not accepted lie detector results as reliable sources of information as to guilt, although usually such rejection has been in connection with the offer of the test's results as evidence at trial. The admission by Greene that he saw the victim's body on the morning of April 8th adds to the suspicions of guilt, but circumstances must be considered in context. It will be remembered that when this statement was made by Greene the prime suspect was still Jerry Cauthen, and Greene was simply trying to reinforce his prior statements that the victim was last seen alive with Cauthen on the night of April 7, 1972, adding now that the body was found the very next morning. Thus, at the prepolygraph stage in the questioning, Detective McGowan recorded a conversation in which Greene was quoted as follows:

"He [Greene] stated . . . at that time Ace [the victim] said to Jerry [Cauthen], 'Are you going to spend the night?' and Jerry said, 'I didn't come out in this weather for nothing . . .'"

Under all of the circumstances, we are satisfied that no actual arrest or arrest-type custody existed prior to the probable cause voluntarily supplied by the defendant at 11:30 a.m. on April 23, 1972, which appears to coincide with the time when the police finally found and questioned Jerry Cauthen. While the failure to find Cauthen accounted for some of the prolonged activities in which defendant participated with the police, there is no evidence that the inculpa-

tory statements sought to be suppressed herein bore any relationship thereto or were in any way caused or influenced thereby.

From the evidence in the suppression hearing, the court makes the following

## FINDINGS OF FACT

1. Defendant reported to the Police Administration Building at 11:40 a.m. on April 22, 1972, on his own initiative, for the purpose of volunteering to the police information which he said that he had which would implicate one, Jerry Cauthen, as the murderer of defendant's sister-in-law, Adelaide Forbes, on April 8, 1972.

2. Defendant remained in Police Headquarters thereafter while the police engaged in running down leads supplied by defendant and seeking to find Jerry Cauthen, the man accused by defendant.

3. At no time prior to 11:30 a.m. on April 23, 1972, did the police have any probable cause to arrest or arraign defendant.

4. At 11:30 a.m. on April 23, 1972, defendant spontaneously confessed to having killed his sister-in-law, Adelaide Forbes, on April 8, 1972.

5. After periods of rest and eating, following the initial confession, defendant participated in giving to the police a formal statement of his activities and guilt in connection with the slaying over a period from 1 p.m. to 2:30 p.m., including the reading and signing of the formal statement.

6. Miranda warnings were given to defendant at 12:35 p.m. on April 22, 1972, when defendant was solely in the role of informer, and again preliminary to the formal agreement at or about 1 p.m. on April 23, 1972.

7. At or about 4 p.m. to 5:10 p.m. on April 22, 1972, defendant voluntarily took a polygraph examination

which raised some question as to his possible involvement in the murder of his sister-in-law, and later on that day, at 9:45 p.m., defendant admitted that he had seen the body of his sister-in-law on April 8, 1972, whereas his detailed description of his activities previously had been that he had only seen her the night before.

8. Inculpatory statements made by defendant on April 23, 1972, were not the result of threats or any course of conduct on the part of the police, but were voluntarily given.

9. On the suppression hearing record now before the court, probable cause for defendant's arrest and for arraignment first existed when defendant made a self-incriminatory statement, admitting the killing, at 11:30 a.m. on April 23, 1972.

10. The time spent by the police during interview periods on April 22, 1972, and thereafter until 11:30 a.m. on April 23, 1972, were in no way a cause of, or a factor in, the obtaining of the inculpatory remarks and the formal statement from defendant.

11. The delay after the taking of the formal statement and before the arraignment was in no way a contributory factor in the obtaining by the police of the inculpatory statements from defendant.

12. The length of defendant's stay in the Police Administration Building prior to his first inculpatory statement at 11:30 a.m. on April 23, 1972, was due to defendant's detailed recitals during periods of discussion with the police when defendant was supplying information as an informer in an effort by defendant to implicate Jerry Cauthen as the murderer, and all of such stay in police contacts and relationships were voluntary and carried out with full knowledge on the part of defendant of his constitutional rights under the circumstances.

## CONCLUSIONS OF LAW

1. Probable cause for arrest and for arraignment of defendant did not exist until at or about 11:30 a.m. on April 23, 1972.

2. Defendant's presence in police relationships prior to 11:30 a.m. on April 23, 1972, was voluntary.

3. There being no coercion or other conduct on the part of the police which would render the inculpatory statements of defendant involuntary, the statements are constitutionally and otherwise valid for trial purposes, subject only to the submission of the voluntariness thereof at the trial.

4. The delays prior to arraignment were not in any way a causative factor in obtaining any of the inculpatory statements from defendant, and the inculpatory statements are valid for trial purposes within the meaning of Pa. R. Crim. P. 118.

5. On the facts in this proceeding and on the law applicable thereto, the inculpatory statements made by defendant on April 22 and 23, 1972, should not be suppressed.

## ORDER

And now, February 25, 1974, the motion and requests by defendant, Oliver Greene, to suppress inculpatory statements made by him are denied.